UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA D. CALLAHAN,                           Case No. 17-14069

　　　　　　Plaintiff,                        Denise Page Hood
v.                                          Chief United States District Judge

COMMISSIONER OF SOCIAL                      Stephanie Dawkins Davis
SECURITY,                                   United States Magistrate Judge

　　　　　　Defendant.
_____/

**REPORT AND RECOMMENDATION**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT (Dkts. 17, 18)**

## I.    PROCEDURAL HISTORY

### A.    Proceedings in this Court

On December 18, 2017, plaintiff Lisa D. Callahan filed the instant suit.

(Dkt. 1).  Pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(b)(3), Chief

District Judge Denise Page Hood referred this matter to the undersigned for the

purpose of reviewing the Commissioner's unfavorable decision denying plaintiff's

claim for a period of disability, disability insurance benefits, and supplemental

security income benefits.  (Dkt. 3).  This matter is before the Court on cross-

motions for summary judgment.  (Dkt. 17, 18).

B.    Administrative Proceedings

Callahan filed an application for a period of disability, disability insurance

benefits, and supplemental security income[1] on September 12, 2014, alleging

disability beginning on April 2, 2010.  (Tr. 30).[2]  Her claims were initially

disapproved by the Commissioner on November 25, 2014.  (*Id.*).  Callahan

requested a hearing and on June 7, 2016, she appeared with a non-attorney

representative, before Administrative Law Judge ("ALJ") Ena Weathers, who

considered the case *de novo*.  (Tr. 30-44).  In a decision dated November 14, 2016,

the ALJ found that plaintiff was not disabled.  (Tr. 44).  The ALJ's decision

became the final decision of the Commissioner when the Appeals Council, on

September 20, 2017, denied plaintiff's request for review.  (Tr. 1-5); *Wilson v.

Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004).

For the reasons set forth below, the undersigned **RECOMMENDS** that

plaintiff's motion for summary judgment be **DENIED**, that defendant's motion for

summary judgment be **GRANTED**, and that the findings of the Commissioner be

**AFFIRMED**.

---

[1] Callahan was insured through September 30, 1990 for disability insurance benefits
purposes.  Therefore, as the ALJ discussed, Callahan is not entitled to disability insurance
benefits because she is not insured.  (Tr. 35-36).  Callahan does not contest this determination.
(Dkt.17, at p. 2).

[2] The Administrative Record appears on the docket at entry number 13.  All references to
the same are identified as "Tr."

## II.    ALJ FINDINGS

Callahan, born December 2, 1967, was 42 years old on the alleged disability onset date. (Tr. 43). She has past relevant work as a leasing agent. (Tr. 42). Callahan is claiming she is disabled because of constant muscle spasms, thoracic disc disease, pain the middle and lower back, tendonitis in her right hand, knee pain, and medication that makes her feel drowsy. (Tr. 75). The ALJ applied the five-step disability analysis and found at step one that plaintiff had not engaged in substantial gainful activity since April 2, 2010, the alleged onset date. (Tr. 32). At step two, the ALJ found that Callahan's adjustment disorder with depression, an anxiety disorder, chronic low back pain, morbid obesity and osteoarthritis of the knees were "severe" within the meaning of the second sequential step. (Tr. 32). However, at step three, the ALJ found no evidence that plaintiff's impairments singly or in combination met or medically equaled one of the listings in the regulations. (Tr. 33).

Thereafter, the ALJ assessed plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is unable to climb ladders, ropes, or scaffolds, but can occasionally crouch, crawl, kneel and climb ramps and stairs, and occasionally perform simple repetitive tasks without strict production demands. The claimant can

3

> frequently interact with the general public; must have the
> ability to change from standing to seated or vice versa for
> up to two minutes every hour to two hours without
> interference with work product; is able to frequently
> perform fine fingering with the right dominant
> upper extremity; is able to occasionally push and pull
> with the lower extremity; and, requires the use a cane or
> walker for ambulation on uneven surfaces.

(Tr. 35).  At step four, the ALJ found that plaintiff was unable to perform any past

relevant work.  (Tr. 42).  At step five, the ALJ denied plaintiff benefits because she

found that there were jobs that exist in significant numbers in the national economy

that plaintiff can perform.  (Tr. 43-44).

## III.   DISCUSSION

### A.    Standard of Review

In enacting the social security system, Congress created a two-tiered system

in which the administrative agency handles claims, and the judiciary merely

reviews the agency determination for exceeding statutory authority or for being

arbitrary and capricious.  *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The

administrative process itself is multifaceted in that a state agency makes an initial

determination that can be appealed first to the agency itself, then to an ALJ, and

finally to the Appeals Council.  *Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is

not found during this administrative review process, the claimant may file an

action in federal district court.  *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir.1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence.").  "However, the ALJ is not free to make credibility determinations based solely

upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive.  42 U.S.C. § 405(g).  Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475.  "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only.  *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  "Both the court of

6

appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

B.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord*, *Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different

eligibility requirements, "DIB and SSI are available only for those who have a

'disability.'"  *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  "Disability"

means:

> inability to engage in any substantial gainful activity by
> reason of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also* 20 C.F.R. § 416.905(a)

(SSI).

The Commissioner's regulations provide that disability is to be determined

through the application of a five-step sequential analysis set forth at 20 C.F.R.

§§ 404.1520, 416.920.  Essentially, the ALJ must determine whether: (1) the

plaintiff is engaged in significant gainful activity; (2) the plaintiff has any severe

impairment(s); (3) plaintiff's impairments alone or in combination meet or equal a

Listing; (4) the claimant is able to perform past relevant work; and (5) if unable to

perform past relevant work, whether there is work in the national economy that the

plaintiff can perform.  (*Id.*).  "If the Commissioner makes a dispositive finding at

any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by her impairments and the fact that she is

precluded from performing her past relevant work."  *Jones*, 336 F.3d at 474, cited

with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step

without a finding rejecting the existence of disability, the burden transfers to the

Commissioner.  *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

At the fifth step, the Commissioner is required to show that "other jobs in

significant numbers exist in the national economy that [claimant] could perform

given [his] RFC and considering relevant vocational factors."  *Rogers*, 486 F.3d at

241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

If the Commissioner's decision is supported by substantial evidence, the

decision must be affirmed even if the court would have decided the matter

differently and even where substantial evidence supports the opposite conclusion.

*McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545.  In other words, where

substantial evidence supports the ALJ's decision, it must be upheld.

C.      Analysis and Conclusions

1.      Treating Physician Rule[3]

Callahan argues that the ALJ's reasons for discounting Dr. Rahimee's

opinion are not good reasons.  The ALJ discounted the opinion because Dr.

Rahimee "lacke[d] program knowledge" and "his opinion [was] not supported by

---

[3] The Commissioner assumed for the sake of argument that Dr. Rahimee signed his May 2016 opinion, rather than just his assistant.  As the Commissioner does not actually challenge— and provides no argument for such a challenge—that the May 2016 document is not a medical opinion signed by Dr. Rahmiee, the undersigned will accept the May 2016 opinion as Dr. Rahimee's opinion.

relevant evidence" but was instead based on Callahan's subjective complaints. (Dkt. 18, at p. 11).  However, according to Callahan, knowledge of the Social Security disability program is a weak factor on which to rely in weighing a medical opinion.  Further, Callahan contends that the ALJ did not properly evaluate the treating physician factors in 20 C.F.R. § 416.927.  Dr. Rahimee's opinion is supported by the record, not just Callahan's subjective complaints.  (*Id.* at p. 11-12).  While the ALJ stated that Dr. Rahimee's opinion was not consistent with treatment notes that showed "negative straight leg raising, unremarkable neurological examinations and intact sensory exams," the ALJ did not explain how Dr. Rahimee's findings of tenderness in her back, decreased flexion and knee popping contradicted his limitations.

The Commissioner contends that the ALJ properly discounted Dr. Rahimee's restrictions because they were poorly supported and inconsistent with the other evidence, including his own treatment notes, which contained mild objective clinical findings, reports that Callahan denied difficulties with her balance or gait, and no indication that she was actually using an assistive device when she saw Dr. Rahimee.  (Dkt. 18, at p. 10).  The ALJ also noted that Dr. Rahimee's opinion was in sharp contrast to consultative examiner Dr. Karo's opinion.  The Commissioner also contends that the ALJ correctly noted that Dr. Rahimee's conclusion that Callahan was "completely disabled" and "unable to

work any job" were not medical opinions, but rather administrative findings reserved to the Commissioner. (*Id.* at p. 11).

The ALJ provided three reasons for giving little weight to Dr. Rahimee's opinion; she found that Dr. Rahimee lacks program knowledge, his opinion is not supported by relevant evidence, and the opinion is primarily based on Callahan's self-reports. (Tr. 40). In addition, the ALJ stated that Dr. Rahimee's opinion that Callahan is disabled is reserved solely for the Commissioner. (*Id.*). In his opinion dated May 17, 2016, Dr. Rahimee listed Callahan's symptoms as follows: chronic pain upper and lower back, bilateral knee pain, bilateral leg weakness with impairment in ambulation, dependence on walker, left hand numbness/tingling, right wrist pain, fatigue, depression, and anxiety. (Tr. 451). According to this opinion, Callahan's pain was persistent despite medication and physical therapy. (*Id.*). Dr. Rahimee assessed severe physical limitations. He opined that Callahan could not walk a block without rest; she could sit for one hour and stand for five minutes at one time; she could sit and stand for less than two hours in an eight-hour workday; she would need to take unscheduled breaks throughout the workday every 15 minutes; she would need to elevate her legs to hip level while seated; she requires the use of a walker for occasional standing/walking; she could never lift any weight; she is significantly limited in repetitive reaching, handling, and fingering; and she would miss more than three days of work per month. (Tr. 453-

55).  Finally, Dr. Rahimee stated that Callahan is "completely disabled at this time,

unable to work any job due to significant impairments in mobility and also of bilat.

upper extremities, medication effects, fatigue, depression, and anxiety."  (Tr. 455).

The opinion of a treating physician should be given controlling weight if it

is: (1) "well-supported by medically acceptable clinical and laboratory diagnostic

techniques," and (2) "not inconsistent with the other substantial evidence in [the]

case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004);

20 C.F.R. § 404.1527(c)(2).  Once an ALJ has determined that a treating source

opinion is not entitled to controlling weight, the ALJ must give good reasons for

the weight accorded to the opinion.  The reasons provided must be supported by

the evidence in the case record and must be sufficiently specific to make clear to

any subsequent reviewers the weight the adjudicator gave to the treating source's

medical opinion and the reasons for that weight.  *Gayheart v. Comm'r of Soc. Sec*.,

710 F.3d 365, 376 (6th Cir. 2013).  The ALJ is to discuss certain factors, which

include, (1) the length of the treatment relationship and frequency of examination,

(2) the nature and extent of the treatment relationship, (3) supportability of the

opinion, (4) consistency of the opinion with the record as a whole, and (5) the

specialization of the treating source.  *Id.; see also Wilson,* 378 F.3d at 544; 20

C.F.R. § 404.1527(c).  Failure to analyze a treating source opinion under the two-

prong controlling weight test amounts to the failure to provide good reasons for giving that opinion less than controlling weight.  *Gayheart* at 376-77.

"Violation of the rule constitutes harmless error if the ALJ has met the goals of the procedural requirement—to ensure adequacy of review and to permit the claimant to understand the disposition of his case—even though he failed to comply with the regulation's terms."  *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 440 (6th Cir. 2010) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004).  An ALJ may meet those goals by indirectly attacking the supportability of the treating physician's opinion or its consistency with other evidence in the record.  *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. Appx. 462, 470-72 (6th Cir. 2006) (no error in ALJ's failure to explain weight given to two treating physicians or failure to give good reasons for discounting them where the ALJ thoroughly explained other medical evidence that indirectly attacked the consistency of the treating physicians' opinions).  In *Coldiron*, the court held that even if the ALJ's stated reasons for rejecting a physician's opinion were not "good reasons," the ALJ sufficiently indirectly attacked the supportability and consistency of the opinion such that any error was harmless.  391 Fed. Appx. at 440-41.  The court found that the ALJ indirectly attacked the consistency of the opinion that the plaintiff could not lift or carry any weight at all, when the ALJ explained that the state agency physicians found that the plaintiff lacked a

"diminished capacity for lifting/carrying." *Id.* And although the physician stated that the plaintiff could walk for only twenty minutes in an eight-hour workday and his ability to sit was limited, other medical evidence showed that he could stand and sit for six hours out of eight. *Id.* at 441. Further, the plaintiff's own statements also undermined the doctor's opinion. *Id.*

Here, while the ALJ did not directly address whether the opinion was well-supported by medically acceptable clinical and laboratory techniques, the ALJ discussed the inconsistencies between Dr. Rahimee's opinion and the other evidence in the record including Dr. Rahimme's own treatment notes. Having discussed the inconsistencies, the ALJ properly determined that the opinion was not entitled to controlling weight. *See Wilson*, *supra*.

The ALJ's discussion also provided good reasons for the weight determination. The ALJ is correct that Dr. Rahimee's opinion is inconsistent with his own treatment notes. For example, in Callahan's examinations with Dr. Rahimee, Dr. Rahimee reported that she was in no acute distress, well-developed, and well-nourished. (Tr. 368, 467, 525). Further, while both of Callahan's knees were positive for subpatellar crepitus, there was no effusion and her MacMurray test was negative. (Tr. 368, 457, 464, 473, 525). From November 2015 through April 2016, Callahan's neurological examinations showed she had normal motor strength in the upper and lower extremities and her sensory exam was intact. (Tr.

368, 457, 460).  In May and August 2016, neurological exam findings were the same except that the sensory exam showed slightly decreased sensation to light touch in the left index and middle finger tips but was otherwise intact.  (Tr. 473, 525).  Dr. Rahimee also repeatedly noted that Callahan denied muscle weakness, gait abnormality, loss of the use of her extremities, and loss of strength.  (Tr. 367, 456, 459, 463, 466).  In April and May 2016, Dr. Rahimee noted that Callahan admitted loss of strength, but she still denied weakness, gait abnormality, and loss of the use of her extremities.  (Tr. 469, 472).  In May 2016, Callahan reported numbness in her left palm, index, and middle fingers and complained of pain in her right wrist.  On musculoskeletal exam, Dr. Rahmiee's findings included right wrist positive Finkelstein's test; the left wrist was negative on Tinel and Phalens testing.  Notwithstanding the noted changes, Dr. Rahimee reported that Callahan nevertheless had normal range of motion in both hands and wrists without swelling.  (Tr. 473).  These treatment notes are inconsistent with the opinions that Callahan (1) cannot lift <u>any</u> weight; (2) cannot sit or stand for less than two hours; (3) needs to use a walker (indeed, there is no treatment note from Dr. Rahimee indicating that Callahan was using an assistive device for standing or walking); and (4) otherwise cannot work because of her impairments.

The ALJ also noted that, despite Callahan's impairments, Dr. Rahimee provided only conservative treatment.  (Tr. 37).  *See Lester v. Soc. Sec. Admin.*,

596 Fed. Appx. 387, 389 (6th Cir. 2015) (Finding that ALJ properly discounted treating physician's opinion where it was inconsistent with his own treatment records, which showed conservative treatment); *Kepke v. Comm'r of Soc. Sec.*, 636 Fed. Appx. 625, 631 (6th Cir. 2016) (Stating that the fact that a treating physician administered conservative treatment is a "good reason" for discounting the opinion). Indeed, the extent of Dr. Rahimee's treatment consisted of refilling or prescribing medication. And there is no indication in the record that Callahan received conservative treatment because of her financial or transportation issues. Although Callahan reported in April 2016 that she was living in a motel, there is no other indication in the record that financial hardship prevented her from receiving treatment; her financial difficulties are not noted as a deterrent to health care. (Tr. 431). Further, as the Commissioner noted, in May 2014 Callahan reported that she was back on health insurance (Tr. 332). Yet, Callahan did not begin receiving treatment for her back and wrist issues until October 2015 (Tr. 363), over a year later. In light of the timing reviewed above, the delay in seeking a health professional would not appear to be attributable to lack of insurance. Callahan also notes that the record documents issues with transportation. (Dkt. 17 at p. 19-20). Notably, however, she does not claim that she failed to seek treatment between May 2014 and October 2015 because of transportation issues. The record does indeed contain notes regarding transportation issues. For example, her

physical therapist noted in April 2016 that Callahan had transportation issues, but also that she had signed up for a shuttle service to get to therapy. (Tr. 478). Callahan also reported to a mental health professional that "transportation is a big obstacle with everything." (Tr. 434). Her transportation issues only appear in her 2015 mental therapy notes and in the 2016 physical therapy notes. (*See, e.g.,* Exhibits 4F, 5F, and 7F; Tr. 478). However, she was able to attend her therapy sessions despite the problems. Neither Dr. Rahimee nor any other physician commented on any problems getting to appointments because of an issue with transportation. Thus, it does not appear that transportation issues prevented her from obtaining more advanced treatment. Further, to the extent that Callahan is suggesting that her transportation issues should have been interpreted as evidence of "financial struggle in receiving treatment," the linkage is tenuous on this record. Callahan acknowledges that she does not have a driver's license or drive, and thus relies on others for transportation. (Dkt. 17 at 20). Hence, the mere fact that she may have encountered difficulty arranging rides to appointments does not necessarily suggest a financial issue; and suggesting error for failing to do so is a bridge too far.

The ALJ also properly addressed the inconsistency between Dr. Rahimee's opinion and the other medical opinion evidence in the record. For instance, the ALJ noted the "sharp contrast" between Dr. Rahimee's opinion and consultative

examining physician Dr. Karo's opinion. (Tr. 39). Callahan presented to Dr. Karo with complaints of bilateral wrist pain and bilateral low back pain. (Tr. 509). Dr. Karo noted that Callahan had decreased and painful range of motion of the cervical and lumbar spine, but full range of motion in all other joints tested. (Tr. 510). There was no muscle atrophy in any of the extremities and muscle tone was normal throughout. Callahan's strength was 5/5 throughout the upper and lower extremities, and sensation was normal in the upper and lower extremities. Dr. Karo opined that the clinical evidence does not support the use of a walker to ambulate. (Tr. 511). Dr. Karo also opined that Callahan did not have any physical limitation of sitting, standing, or walking. Dr. Karo found that Callahan could frequently lift and carry up to 20 pounds and occasionally lift up to 10 pounds (Tr. 516), and that she could sit for four hours, stand for two hours, and walk for one hour in a workday. (Tr. 517).

The other medical evidence regarding her physical impairments comes from her physical therapy treatment notes. She presented to physical therapy for low back pain that had gradually been getting worse. It appears that she was noted to be ambulating with a cane and she had an antalgic gait. (*See* Tr. 479, 480). The therapist was unable to test Callahan's lumbar range of motion due to Callahan's complaints of pain. (Tr. 480). Callahan was recommended to use a walker. (Tr. 484). While these treatment notes indicate difficulty walking and that Callahan

was recommended a walker, they do not themselves support the extent of Dr.

Rahimee's severe limitations.  For example, the treatment notes do not suggest that

Callahan can stand for only five minutes and walk for less than two hours in an

eight-hour workday, or that she otherwise cannot perform work-related activities

on a sustained basis.

The ALJ's discussion of Dr. Rahimee's opinion and the medical evidence

provided good reasons for the weight determination.  Dr. Rahimee's treatment

notes paint a different picture of Callahan's functional abilities than does his

opinion: his treatment notes do not suggest work-preclusive functional limitations

while his opinion renders her unable to work.  Further, while the physical therapy

notes indicate that Callahan suffered from back pain and that she should use a

walker, Dr. Karo found that Callahan could perform work-related activities despite

her impairments.  Although the ALJ did not specifically address the nature and

extent of the treating relationship, or any specialization in which Dr. Rahimee

practices, this failure is harmless.  As the Sixth Circuit held in *Francis v. Comm'r*

*of Soc. Sec.*, 414 Fed. Appx. 802, 805 (6th Cir. 2011) (quoting *Friend v. Comm'r*

*of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010)), the treating physician rule

is not "a procrustean bed, requiring an arbitrary conformity at all times."  In

*Francis,* the ALJ did not discuss several of the factors set out in 20 C.F.R.

§ 404.1527(d)(2), but the court held that he did not have to do an exhaustive factor-

by-factor analysis.  *Id*. at 804-05.  As long as the goal of the regulation is met, i.e. providing a clear understanding of the reasons for the weight given to a treating physician's opinion, any procedural error will be harmless.  As demonstrated above, the goal of the regulation has been met here.

Additionally, the ALJ did not err in disregarding Dr. Rahimee's opinion that Callahan could not work (Tr. 40) as that conclusion addresses the ultimate decision of disability which is reserved to the Commissioner.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 286 (6th Cir. 2009) ("Conclusory statements from physicians are properly discounted by ALJs"); *see also Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) ("'The determination of disability is ultimately the prerogative of the Commissioner, not the treating physician.' *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985).").

For the foregoing reasons, the undersigned finds that the ALJ did not commit reversible in weighing Dr. Rahimee's opinion.  The weight determination is supported by substantial evidence and thus should be affirmed.

### 2.    Physical RFC Determination

Callahan argues that the RFC is not supported by substantial evidence. Specifically, Callahan contends that the RFC determination is not based on any medical opinion but was formulated based on the ALJ's own independent medical findings.  (*Id.* at p. 14).  The RFC assessment must include a discussion of why

functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence. Here, according to Callahan, the ALJ dismissed all of the medical opinions and gave her own interpretation of the evidence. The ALJ accorded significant weight to consultative examiner Dr. Karo's opinion, yet the ALJ did not adopt Dr. Karo's assessment. (*Id.* at p. 14-15). Dr. Karo opined that Callahan could sit for four hours, stand for two hours, and walk for one hour; in other words, Dr. Karo concluded that Callahan was able to work a maximum of seven hours. (*Id.* at p. 15). The regulations however, require that an individual must be found to be capable of working eight hours. (*Id.* citing SSR 96-8p). The ALJ also did not adopt Dr. Karo's restriction of occasional reaching, handling, fingering, feeling, and push/pull, bilaterally with the upper extremities. Instead, Callahan says the ALJ, without medical support, limited Callahan to frequent fingering with the right dominant upper extremity. And, the ALJ limited plaintiff's use of a walker to "uneven surfaces," without anything in the record supporting this limitation. (*Id.* at p. 16). As a result of the flawed RFC, the ALJ provided a faulty hypothetical to the vocational expert at step five because the RFC and hypothetical did not include all of Callahan's limitations. (*Id.* at p. 17).

The Commissioner argues that the RFC need not be based on a medical opinion and that the ALJ was not required to incorporate all of Dr. Karo's

restrictions into the RFC. According to the Commissioner, the Sixth Circuit has

repeatedly held that the RFC assessment is an administrative finding that need not

be based on a medical opinion. (*Id.* at p. 13) (citing *Mokbel-Aljahmi v. Comm'r of

Soc. Sec.*, 732 Fed. Appx. 395, 401-402 (6th Cir. Apr. 30, 2018); *Shepard v.

Comm'r of Soc. Sec.*, 705 Fed. Appx. 435, 442-43 (6th Cir. 2017); *Rudd v. Comm'r

of Soc. Sec.*, 531 Fed. Appx. 719, 728 (6th Cir. 2013)). It is the ALJ, not a medical

professional, who ultimately determines a claimant's RFC and the ALJ properly

does so by weighing the medical and non-medical evidence. (*Id.* at p. 14).

Accordingly, the ALJ is not "obligated to draft an RFC assessment which

comported with one drafted by a physician, and [is] instead entitled to create an

RFC based on [her] evaluation of the available medical evidence." (*Id.* citing

*Sparrow v. Comm'r of Soc. Sec.*, 2016 WL 1658305, at *7 (E.D. Mich. Mar. 30,

2016)). The Commissioner contends that the ALJ is not obligated to adopt the

entire report of an opinion the ALJ relied upon but may instead piece together

relevant facts from multiple opinions. Further, according to the Commissioner, the

ALJ was entitled to create an RFC based on her evaluation of the medical evidence

and was not required to craft the RFC based entirely on Dr. Karo's opinion. (*Id.* at

p. 16). *Price v. Comm'r of Soc. Sec.*, 2016 WL 3193025, at *2 (E.D. Mich. June 9,

2016). Additionally, the Commissioner contends that although Dr. Karo's opinion

indicates that Callahan could sit, stand, and walk for just seven hours in work day,

this is not necessarily incompatible with an RFC for full-time work. The Commissioner's regulations presume that the typical eight-hour workday includes scheduled breaks at two-hour intervals (i.e., morning, lunch, and afternoon breaks). (*Id.* at p. 17). Hence, according to the Commissioner, even if Dr. Karo's checkbox opinion on limitations could be construed as mathematically disabling, the ALJ reasonably focused instead on the "overall tenor" of Dr. Karo's report. (*Id.* at p. 18). Further, substantial evidence supports the finding that additional manipulative limitations were not warranted beyond the ALJ's limitation of frequent fingering with the right hand. In 2016 Callahan retained normal range of motion in the right wrist and normal motor strength throughout the upper extremities. The Commissioner posits that the ALJ did not need a medical license to deduce that "normal" hand and wrist motion and full motor strength in both upper extremities do not correlate with significant manipulative limitations. (*Id.* at p. 19). In sum, the Commissioner contends that the record provides substantial evidence to support the RFC with respect to Callahan's use of her hands and arms, notwithstanding Dr. Karo's more restrictive opinion in that regard. (*Id.* at p. 20-21).

The undersigned suggests that there is no error in the RFC assessment. Contrary to Callahan's assertion, the RFC does have a "medical underpinning" and is supported by substantial evidence. Residual functional capacity is defined as

"the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c). "In formulating a residual functional capacity, the ALJ evaluates all relevant medical and other evidence and considers what weight to assign to treating, consultative, and examining physicians' opinions." *Eslinger v. Comm'r of Soc. Sec.*, 476 Fed. Appx. 618, 621 (6th Cir. 2012) (citing 20 C.F.R. § 404.1545(a)(3)); *Rudd v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 719, 728 (6th Cir. 2013). Pursuant to 20 C.F.R. § 404.1527(d), the final responsibility for deciding issues such as the claimant's residual functional capacity is reserved to the Commissioner. "Although the ALJ may not substitute his opinion for that of a physician, he is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding." *Poe v. Comm'r of Soc. Sec*., 342 Fed. Appx. 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3)). An ALJ improperly assumes the role of doctor if an RFC is formed without a medical opinion and is based solely on the ALJ's own interpretation of raw medical evidence, but that is not the case here. *Gross v. Comm'r of Soc. Sec*., 247 F. Supp. 3d 824, 829 (E.D. Mich. 2017).

Although the ALJ gave only little weight to Dr. Rahimee's opinion, she gave significant weight to Dr. Karo's opinion. The RFC was based, at least in part, on Dr. Karo's medical opinion. In accord with many of Dr. Karo's limitations, the

ALJ limited Callahan to light work (and thus lifting up to 10 frequently and up to 20 pounds occasionally, less weight that Dr. Karo recommended); to occasional postural activities such as crouching or crawling; the ability to change from standing to seated and vice versa for up to two minutes every hour; and occasionally pushing or pulling with the lower extremities. (Tr. 35).[4] These portions of the RFC are directly supported by and related to Dr. Karo's opinion. Therefore, it is not accurate to say that the RFC does not have a "medical underpinning."

There is, admittedly, some inconsistency between Dr. Karo's opinion and the RFC though. As Callahan points out, the RFC limits her to frequent fingering with the right upper extremity and the use of a walker for uneven surfaces, whereas Dr. Karo limited her to occasional use of the upper extremities and no use of an assistive device. Because the ALJ was not required to adopt all of Dr. Karo's opinion, this departure from Dr. Karo's opinion does not result in error.

---

[4] As stated above, Dr. Karo found full active range of motion in all joints except the cervical and lumbar spine, Callahan's strength was 5/5 throughout the upper and lower extremities, and her muscle tone was normal throughout the upper and lower extremities. (Tr. 510). Dr. Karo opined that, although Callahan ambulated with a walker the clinical evidence did not support the need to use an assistive device and the clinical evidence did not support any physical limitation to sitting, standing, and walking. (Tr. 511). Dr. Karo also opined that bending, stopping, and squatting were limited secondary to low back pain and carrying, pushing, and pulling were limited secondary to complaints of carpal tunnel syndrome. (Tr. 511). In the check-box portion of the opinion, Dr. Karo opined that Callahan could lift up to 10 pounds continuously and up to 20 pounds frequently (Tr. 516); Callahan could sit for four hours, stand for two hours, and walk for one hour in a work day (Tr. 517); and Callahan could occasionally reach, finger, feel, and handle with both hands. (Tr. 518).

As stated, when evaluating the claimant's RFC, the ALJ is not required to base his or her RFC findings entirely on a physician's opinion even if the opinion is given great weight. *See Brown v. Comm'r of Soc. Sec.*, 602 Fed. Appx. 328, 331 (6th Cir. 2015); *see also Rudd v. Comm'r of Soc. Sec.*, 531 Fed. Appx. 719, 728 (6th Cir. 2013) ("[T]o require the ALJ to base her RFC finding on a physician's opinion, 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication off the Commissioner's statutory responsibility to determine whether an individual is disabled.'") (citation omitted). However, when determining a claimant's RFC, "[i]t is well established that the ALJ may not substitute his medical judgment for that of the claimant's physicians," and an ALJ may not interpret raw medical data in functional terms. *Brown v. Comm'r of Soc. Sec.*, 2015 WL 1431521, at *7 (W.D. Mich. Mar. 27, 2015) (citing *Meece v. Barnhart*, 192 Fed. Appx. 456, 465 (6th Cir. 2006)); *see Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 194 (6th Cir. 2009); *Gross v. Comm'r of Soc. Sec.*, 247 F. Supp. 3d 824, 829 (E.D. Mich. 2017) (holding that it is error for the ALJ to formulate an RFC "without the benefit of *any opinion evidence*" but also noting that an ALJ is not required to entirely base the RFC finding on the opinion of a physician—the RFC assessment must be supported by substantial evidence and not be based on the ALJ's own medical interpretation of the record.) (emphasis in

original). "[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009). Nevertheless, the ALJ remains obligated to make a logical bridge between the evidence relied on and the conclusion reached. *See Gross v. Comm'r of Soc. Sec.*, 247 F.Supp.3d 824, 829-30 (E.D. Mich. 2017).

Regarding the RFC limitation to frequent use of the right upper extremity, while neither Dr. Karo nor Dr. Rahimee stated that Callahan could frequently finger with the right upper extremity, it does not appear that the ALJ based this limitation on her own evaluation of *raw* medical evidence. As the ALJ discussed, on May 17, 2016, the date of Dr. Rahimiee's opinion, Dr. Rahimee noted in a treatment record that, despite a positive Finkelstein's test in the right wrist, Callahan had normal range of motion in both hands and wrists without swelling. (Tr. 37). In August Dr. Rahimee again noted full range of motion in both hands and wrists. (Tr. 37; 525). The ALJ discussed Dr. Rahimee's finding in August 2016 that neurological examination revealed normal motor strength but slightly decreased sensation to light touch to the left index and middle finger tips but no similar findings regarding the right hand. (Tr. 39). EMG testing was positive for carpal tunnel syndrome but showed left wrist greater than right wrist. (Tr. 498). According to Dr. Karo, Callahan had full active range of motion in all joints tested

except for the cervical and lumbar spine and her strength was 5/5 throughout the

bilateral upper and lower extremities with no focal weakness detected.  (Tr. 510).

Dr. Karo opined that Callahan could button clothes, tie shoes, dress and undress,

dial a telephone, pick up a coin, pick up a pencil, and write, presumably with both

hands.  (Tr. 512).[5]  The ability to engage in these tasks does not suggest limitation

in the use of her hands.  Further, the other medical evidence just recounted does

not indicate that Callahan is more limited than stated in the RFC with regard to her

right upper extremity.  This is not a case where the ALJ interpreted raw medical

data for herself: "full range of motion" and normal strength are not complicated

medical findings in need of expert interpretation.  The ALJ was not required to

adopt all of Dr. Karo's opinion and, ultimately, substantial evidence supports the

RFC determination with regard to the use of Callahan's right hand.

The fact that the ALJ included a restriction requiring use a walker on uneven

surfaces even though Dr. Karo stated that no clinical evidence supported the need

to use an assistive device is not error.  The ALJ's assessment of an RFC containing

greater limitations than the medical evidence includes does not undermine the

RFC.  *Ross v. Comm'r of Soc. Sec.*, 2015 WL 1245830, at \*11 (E.D. Mich. Mar.

---

[5] While the ALJ did not discuss this portion of Dr. Karo's opinion, the ALJ is not required to discuss every piece of medical evidence.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted).

18, 2015) ("The fact that the ALJ imposed more restrictions when assessing Ross'

RFC than set forth in Dr. Mian's opinion does nothing to discount the ALJ's

decision.") (citing *Carstens v. Comm'r of Soc. Sec*, 2013 WL 3245224, *6 (D.P.R.

June 26, 2013)).

Lastly, with regard to Dr. Karo's check-box opinion mathematically limiting

Callahan to seven hours of work per day, there is also no error.  Again, the ALJ is

not required to adopt all of the restrictions from a physician, even if the ALJ gave

that physician's opinion great weight.  *Price v. Comm'r of Soc. Sec.*, 2016 WL

3193025, at *2 (E.D. Mich. June 9, 2016) ("[A]n ALJ is not required to adopt all of

an examining source's findings, even if the ALJ gives the opinion great weight.")

(citing *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, at *11 (N.D. Ohio Mar.

19, 2013)).  Therefore, the fact that the ALJ neglected to adopt a limitation to

seven hours of sitting, standing, and walking is not error.  This is especially so

here, because, aside from the seven-hour opinion, there is no other indication in the

entire opinion that Dr. Karo believes that Callahan is precluded from performing

work-related activities on a sustained, full-time basis.  Indeed, the remainder of the

opinion indicates that Callahan can sustain work activity for eight hours.  For

example, in addition to many of Dr. Karo's statements discussed above showing

functionality, Dr. Karo opined that Callahan could continuously (for more than 2/3

of an eight-hour day) lift and carry up to 10 pounds, frequently (from 1/3 to 2/3 of

an eight-hour day) lift and carry up to 20 pounds, and occasionally (up to 1/3 of an eight-hour day) lift and carry up to 50 pounds.  (Tr. 516).  In other words, Dr. Karo opined that Callahan can lift and carry weight for eight hours a day.  In her narrative opinion, Dr. Karo stated that the clinical evidence did not support any physical limitation of sitting, standing, and walking but that Callahan was limited secondary to chronic pain, morbid obesity, arthritis, and complaints of carpal tunnel syndrome.  (Tr. 511).  Because the ALJ was not required to adopt all of Dr. Karo's opinions, and because Dr. Karo's opinion predominantly indicates that Callahan can work on a sustained basis, there is no error here.

       3.     Credibility

Callahan argues that the ALJ improperly evaluated her subjective complaints.  Callahan asserts that her testimony is consistent with the "vast majority" of the evidence and history that shows inability to work on a sustained basis.  (*Id.* at p. 18).  The ALJ dismissed her complaints, noting both lack of treatment and conservative treatment as reasons for doing so.  (*Id.* at p. 19).  In relying on the amount and type of treatment she received as reasons to discount her complaints, Callahan says the ALJ failed to consider her financial hardship and issues with transportation which are documented in the evidence.  The ALJ also did not consider the fact that Callahan was prescribed strong opioids for her pain

and that she was recommended for carpal tunnel surgery.  (*Id.* at p. 20).  Callahan also asserts that her complaints are consistent with her daily activities.

The Commissioner argues that the ALJ properly evaluated Callahan's subjective complaints.  The ALJ's evaluation of subjective complaints is entitled to "special deference" and the evaluation should not be disturbed absent compelling reason.  (*Id.* at p. 21).  While Callahan contends that the ALJ improperly neglected to consider her financial hardship when she noted that Callahan received limited and conservative treatment, the Commissioner contends that it is not enough for Callahan to show financial problems; she must show that those problems actually prevented her from obtaining treatment.  (*Id.* at p. 22).  While the record contains evidence that Callahan had transportation issues and lacked health insurance at times, it also shows that she had reasonable access to health care.  She reported in May 2014 that she "got health insurance back" (Tr. 332), yet she did not seek treatment for her physical impairments until October 2015—nearly a year-and-a-half later (Tr. 363).  According to the Commissioner, a temporary lapse in insurance coverage does not explain her failure to seek medical attention while she had coverage.  Further, the Commissioner notes that transportation was not a significant barrier to treatment as Callahan was able to get to and from psychiatric appointments and was able to find a shuttle service for her physical therapy appointments.  (*Id.* at p. 23).  The Commissioner also notes that there is no

31

indication that Callahan's physicians refrained from recommending less conservative treatment because of financial issues.

"Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ." *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). "Upon review, [the court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not required to accept the testimony of a claimant if it conflicts with medical reports, the claimant's prior statements, the claimant's daily activities, and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Rather, when a complaint of pain or other symptoms is in issue, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, s/he must consider "the entire case record, including the objective medical evidence, statements and other information provided by treating or examining physicians . . . and any other relevant evidence in the case record" to determine if the claimant's claims regarding the level of his pain are credible. SSR 96-7p, 1996 WL 374186, at *1;

*see also* 20 C.F.R. § 416.929.  "Consistency between the plaintiff's subjective

complaints and the record evidence tends to support the credibility of the

[plaintiff], while inconsistency, although not necessarily defeating, should have the

opposite effect."  *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852, 863 (6th

Cir. 2011).

The ALJ did not err in her credibility determination.  Rather, the ALJ fully

supported her credibility determination, and there is no compelling reason to

disturb the ALJ's credibility determination.  The ALJ found Callahan's statements

not entirely consistent with the medical evidence.  (Tr. 41).  The ALJ noted that,

despite Callahan's complaints of long-standing back pain, there are no medical

records for her back until May 2012.  At that time, she was taking only over the

counter medication for her pain.  (Tr. 36).  After July 2012, Callahan returned for

follow-up care in November 2015.  The ALJ noted that Callahan's care between

January and May 2016 was conservative and did not include treatment by a pain

specialist including the administration of epidural steroid injections.  (Tr. 37).  In

August 2016 Callahan reported worsening pain, yet, as the ALJ noted, there were

no updated MRIs (last MRI was performed in 2012) and no EMG studies that

could document lumbar radiculopathy.  (Tr. 38).  Although Dr. Rahimee discussed

with Callahan about seeing a pain specialist, Callahan wanted to wait until she

33

underwent an MRI; however, there are no current MRIs or other diagnostic tests in the record.  (Tr. 39).

The ALJ did not err in calling into question Callahan's claim of disability based on the lack of treatment in the record.  It is reasonable to expect some medical evidence demonstrating disability when the plaintiff claims she is disabled.  *See Strong v. Soc. Sec. Admin*., 88 Fed. Appx. 841, 846 (6th Cir. 2004) ("In the ordinary course, when a claimant alleges pain so severe as to be disabling, there is a reasonable expectation that the claimant will seek examination or treatment.  A failure to do so may cast doubt on a claimant's assertions of disabling pain."); *Clayton v. Astrue*, 2013 WL 427407, at *5 (S.D. Ohio Feb. 1, 2013) (Noting that, "although Plaintiff's [sic] contends that she failed to obtain mental health treatment due to lack of insurance the record contains no evidence that she ever sought free or low-cost mental health treatment."); *see also Crum v. Comm'r of Soc. Sec*., 660 Fed. Appx. 449, 455 (6th Cir. 2016) (The court found that the ALJ's reliance on a gap in the medical records supported the ALJ's conclusion that an impairment was not disabling – even though plaintiff had argued that some of his non-treatment was due to lack of insurance).

Further, it does not appear that lack of health insurance or financial hardship prevented Callahan from obtaining treatment after May 2014.  In May 2014 Callahan reported that she was back on health insurance (Tr. 332), yet, without

explanation, Callahan did not begin receiving treatment for her back and wrist issues until October 2015 (Tr. 363), over a year later.  While Callahan states her conservative treatment can be explained by financial hardship, she provides no further development of how financial hardship left her with only conservative treatment.  Indeed, there is no indication in the record that the delay in treatment or the conservative nature of the treatment were due to a health insurance issue or financial hardship.  Callahan also claims that transportation difficulties prevented her from seeking treatment, but any issues she may have had with transportation do not undercut the ALJ's credibility determination.  While the record contains notes regarding transportation issues,[6] her transportation issues only appear in her 2015 mental therapy notes and in the 2016 physical therapy notes, (*see, e.g.,* Exhibits 4F, 5F, and 7F; Tr. 478), and she was able to attend her therapy sessions despite the problems.  Importantly, neither Dr. Rahimee nor any other physician commented on any problems getting to appointments because of an issue with transportation.  There is no indication in the record that her medical treatment was negatively affected by transportation issues.

---

[6] For example, as stated above, her physical therapist noted that she had transportation issues, but also that she had signed up for a shuttle service to get to therapy.  (Tr. 478).  Callahan also reported to a mental health professional that "transportation is a big obstacle with everything."  (Tr. 434).

The ALJ also discussed the inconsistency between Callahan's claims of restrictive activities of daily living and her reports to physicians about her daily activities.  The regulations specifically require ALJs to consider daily activities as part of their credibility analysis.  Soc. Sec. Ruling 96-7p, 1996 WL 374186; *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 532 (6th Cir. 1997) ("An ALJ may also consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments."); *Yackley v. Comm'r of Soc. Sec.*, 2017 WL 3837274, at *11 (E.D. Mich. Aug. 31, 2017) ("[I]t is entirely appropriate for the ALJ to consider the claimant's daily  activities, among other factors, when determining his work function—indeed, the regulations direct the ALJ to do so."); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.2d 532, 542 (6th Cir. 2007) (affirming credibility analysis where ALJ noted daily activities such as light cooking, laundry, shopping, and personal care, did not reflect disabling disorder). For example, in *Blacha*, the Sixth Circuit found that the ALJ had "an adequate basis to discount [the claimant's] credibility" in part because "some of [his] activities were inconsistent with his claims of disabling pain."  *Blacha v. Sec'y of Health and Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).  "Especially significant," the court found, was the claimant's ability to drive, because it showed relatively good use of the arms and that he was able to turn his neck.  *Id.*

In this case, Callahan's daily activities do not comport with allegations of disability.  While Callahan reported requiring assistance with activities such as bathing and dressing and was almost entirely dependent on her sister and her boyfriend, Callahan reported to Dr. Daldin on July 13, 2016, that she was able to perform simple, light chores, dress and shower independently, and shop with her boyfriend.  (Tr. 38, 501).  The ALJ also discussed Dr. Karo's opinion that Callahan could engage in a wide range of activities, such as shopping, traveling without a companion, walking without assistance, use public transportation, climb a few steps, prepare a simple meal and feed herself, and care for her personal hygiene. (Tr. 40, 521).

The ALJ's discussion here demonstrates that she considered plaintiff's complaints, the objective medical evidence, and the consistency of his complaints with his own statements to physicians and with the record evidence.  The ALJ's credibility determination thus comports with the regulation and the undersigned finds no basis on which to disturb the credibility determination.

## IV.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that plaintiff's motion for summary judgment be **DENIED**, and that defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Local Rule 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 4, 2019                          s/Stephanie Dawkins Davis
                                                Stephanie Dawkins Davis
                                                United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on February 4, 2019, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record.

s/Tammy Hallwood
Case Manager
(810) 341-7850
tammy_hallwood@mied.uscourts.gov